1

2

3

4

5

6

7

8           IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CARLOS BARAJAS RAMIREZ,

11           Petitioner,                2: 10 - cv - 1417 - MCE TJB

12     vs.

13   JAMES A. YATES, Warden

14           Respondent.          ORDER, AMENDED FINDINGS AND

15                                RECOMMENDATIONS

16   _____/

17                    I.  INTRODUCTION

18           Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas

19   corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a jury of spousal rape, sodomy

20   by force and corporal injury on a spouse.  Petitioner received a sentence of seventeen years

21   imprisonment.  Petitioner raises numerous ineffective assistance of counsel claims in his federal

22   habeas petition; specifically:  (1) ineffectiveness for failing to impeach Petitioner's wife (Rosa)

23   on her prior crimes ("Claim I"); (2) ineffectiveness for failing to establish Rosa's biasness and

24   motive to lie ("Claim II"); (3) ineffectiveness for failing to impeach Rosa with other acts which

25   reflected her dishonesty and manipulation ("Claim III"); (4) ineffectiveness for failing to impeach

26   Rosa with her prior purportedly inconsistent statements of the assault ("Claim IV") (5)

1

ineffectiveness for failing to impeach Rosa with dildo photos ("Claim V"); (6) ineffectiveness for failing to consult with a forensic expert on sexual assault, failing to subpoena records from Planned Parenthood, failing to contact people from an ambulance who might have seen the incident and failing to subpoena Rosa's psychiatric records ("Claim VI"); (7) ineffectiveness for failing to have Petitioner testify on his own behalf at trial ("Claim VII"); and (8) ineffectiveness for failing to present evidence of Petitioner's good character ("Claim VIII"). For the following reasons, the habeas petition should be denied.

## II. FACTUAL BACKGROUND[1]

Defendant and Rosa S. married in 1996, and have two children together. The two separated in 2002, when Rosa left with their children and went to live in a battered woman's shelter after defendant slapped her during a fight. He had struck her at least one time before that.

Although separated, Rosa and defendant resumed seeing each other anywhere from once a week to once a month, both to take care of matters pertaining to their children, but also to continue their sexual relationship. After their separation, defendant struck Rosa on at least two occasions and was verbally abusive. After a slapping incident on December 26, 2001, Rosa told police that he had assaulted her six prior times either by hitting her, throwing things at her, or pulling on her clothes or hair.

On June 12, 2003, Rosa was working a shift that ended at 10:00 or 11:00 p.m. Defendant called Rosa at approximately 6:00 p.m. and they argued about the children and about Rosa having told defendant's sister that she and defendant still had a sexual relationship. Defendant told Rosa that he was coming over and it was arranged that Rosa would meet him outside the store. When Rosa saw defendant's truck, a white Chevy pickup, she clocked out of work, got into her own car, and drove one block to where defendant was parked.

Defendant had parked on an empty street near a field. He and Rosa had met and had sex at that location before, and Rosa knew that one of the reasons defendant had come was to have sex. When Rosa got out of her car, it was about 8:00 p.m. and beginning to get dark. As Rosa approached defendant's truck, she was shaking.

---

[1] The factual background is taken from the California Court of Appeal, First Appellate District opinion dated October 22, 2009 and filed by Respondent in this case on October 5, 2010 as Lodged Exhibit 13 (hereinafter the "Slip Op.").

Defendant told her to get in the truck if she was cold.  After Rosa got in the passenger side of the truck, she and defendant talked for a few minutes.  At some point, defendant got out of the truck and approached Rosa on the passenger side.  At this point, Rosa was halfway out of the truck, her body resting against the seat and her feet touching the ground.  Defendant came up right next to her and began touching Rosa and unbuttoning their clothes.  When his cell phone rang, defendant told Rosa that he wanted to have sex with her, but that she needed to "hurry up" because his girlfriend was calling and he needed to leave soon.  He told Rosa that his girlfriend was pregnant and could not have sex with him because she was feeling sick.

Rosa became very upset hearing defendant talk about his pregnant girlfriend.  She testified, "He made me feel like I'm nobody, like the worse person in the world.  Like when you're with the person you love and they telling you to hurry up because my girlfriend is waiting for me, and . . . she cannot have sex with me so . . . I have it with you.  That really hurt feelings."  She told him she would not have sex with him and that he should go to his girlfriend.  Defendant responded that he was not "asking" her, he was "telling" her they were going to have sex.

Defendant grabbed Rosa's hands and pulled her hair, forcing her to turn around and bend over the passenger seat.  Rosa kept telling defendant, "No," but he kept repeating that he was not asking her.  After forcing Rosa's face down on the passenger seat, defendant began pulling her pants down while grabbing her arms and pulling them behind her back so that she could not resist him.  When Rosa tried to turn around and resist defendant, he slapped her several times.  He then pulled his pants down and tried to penetrate Rosa's vagina with his penis, but was unable to do so because she kept moving to get away from him.

Still struggling with Rosa, defendant put his penis in her anus.  Rosa had never had anal intercourse with defendant.  When Rosa told him to stop because it hurt and said she wanted to get up, defendant started slapping her on the face, cutting her lip.  During the sexual assault, defendant further injured Rosa by biting her waist and "butt cheek."  He also left "hand marks" on Rosa's buttocks from spanking her hard, marks that remained there the next day, and on her wrists, arms, and legs.  The marks on Rosa's legs were caused by defendant trying to force them apart.

Defendant started to ejaculate inside Rosa's anus, and then pulled out and put his penis in her vagina.  After he had ejaculated, defendant pushed Rosa away, pulled his zipper up, told her he was sorry, and got into his truck and left.  Rosa pulled her pants up and went back to work to finish the last 10 minutes of her shift before going home.  Rosa did not tell anyone at work what had happened because she felt embarrassed.

3

When she got home, Rosa took a bath because she was dirty and bleeding.  It was painful for her to sit down due to the injuries she had sustained.  She did not call the police because she still loved defendant and did not want to get him in trouble.

Rosa's vagina, anus, and legs were sore, and her vagina and anus were bleeding the next day.  She had a previously scheduled appointment with Planned Parenthood at 9:00 a.m. that morning, which she kept.  Rosa Silvia, a medical assistant at Planned Parenthood at the time, testified that Rosa appeared to be "shaken up" and "distraught" when she arrived.  Not wanting to get defendant in trouble, Rosa initially claimed that she had hurt herself falling in the bathtub.  After examining her, the staff did not believe she had injured herself, and began to question her about how she had gotten her injuries.  She eventually told them about what defendant had done to her.

The Planned Parenthood staff contacted the police department.  Officer Trisha Hart arrived and spoke to Rosa about her injuries.  She observed that Rosa was having a difficult time sitting due to the pain she was in.  Rosa informed Hart that defendant sexually assaulted her, including putting his penis in her anus and vagina.  Rosa was taken to the hospital for a sexual assault examination that afternoon.  Judy Herriman, a sexual assault nurse examiner for the Napa Solano Sexual Assault Response Team (SART), testified that Rosa had bruises and scratches on her breasts, legs, hips, wrists, lips, and face, as well as an abrasion in the vaginal area.  The skin of her anus had been broke, fluid was oozing from that area, and there was some bruising "all the way around the anal opening."  Herriman opined that the conditions observed were consistent with trauma caused by forcible sexual penetration of the anus.  On cross-examination, Herriman acknowledged that consensual anal sex can also result in trauma, particularly if lubrication is not used.  Swabs of Rosa's anus contained semen and her underwear contained visible blood.  DNA testing of the swab established that defendant could not be excluded as the source of the male DNA found there.  The prosecution's forensic DNA expert testified that only 1 in 820,000 Hispanics, 1 in 1.6 million Caucasians, and 1 in 21 million African-Americans had DNA that could be consistent with the male DNA in the sample.

Vacaville Police Officer Steve Howisey testified that he was employed as a police officer by the City of Suisun in June 2003.  He assisted with Officer Hart's investigation of Rosa's rape complaint and interviewed defendant after his arrest.  During the interview, defendant acknowledged meeting Rosa on the evening of June 12, 2003.  Defendant told Howisey that Rosa performed oral sex on him, but that they did not have intercourse or engage in any other sexual contact.  Defendant also told Howisey that prior to June 12, 2003, he had not had any sexual contact with Rosa for

4

approximately three months.

Rosa testified that she did not see defendant at all for about the next one and one-half to two years following the incident.  At that point, they began talking again and then secretly resumed a sexual relationship.  They had anal sex together and also had sex in defendant's truck.  They had sex in Rosa's car less than two weeks prior to her testimony at trial.  Rosa was not sure whether she was still in love with defendant, but she felt a "need to be with him" and was fearful he would otherwise not let her see her children.  On several occasions after the incident, defendant asked Rosa not to show up for court.  He also asked her to lie for him, and Rosa said she would.

B.  *Defense Case*

The defense rested without calling any witnesses.  Defense counsel argued in closing that defendant and Rosa had "rough consensual sex" on the night in question.  He pointed out that although Rosa had called the police when she had had arguments or problems with defendant in the past, she did not call the police after the alleged rape and did not call any friends to help her.  He further maintained that Rosa's injuries were consistent with rough consensual sex.  Counsel suggested that Rosa might have lied about the sex because she was mad at defendant over his girlfriend or embarrassed to tell the examining personal that she had consensual sex or saw the rape accusation as a way of regaining custody of her children.

(Slip Op. at p. 1-5.)

## III.  PROCEDURAL HISTORY

After Petitioner was convicted by a jury, he moved for a new trial.  (See Clerk's Tr. at p. 368.)  In the motion for a new trial, Petitioner listed the following items which he argued established that a new trial was necessary:

A)  The failure to present evidence that Rosa had two motives to lie.  One motive was to have Carlos Ramirez put in prison so that [Rosa] could get custody of their children.  The second motive was for [Rosa] to establish her status as a victim of domestic violence so that she could get a green card in order to lawfully immigrate to the United States;

B)  The failure to impeach [Rosa] with her criminal history and her character traits for dishonesty;

C)  The failure to impeach [Rosa] with her inconsistent statements;

D)  The failure to present evidence showing that [Rosa] has a history of making false complaints against Carlos Ramirez and

other people;

E)  The failure to bring out [Rosa]'s character traits for passive-aggressive behavior with the defendant.  The evidence shows that [Rosa] had been both passive and aggressive toward the defendant.  At times she has appeared to be meek in front of Carlos Ramirez, but this was a front according to her plan to frame him;

F) The failure to investigate by not doing the following:  (a) filing a Welfare and Institutions Code section 827 motion for juvenile and Children's Protective Services ("CPS") contracts concerning Ms. [Rosa]; (b) serving a subpoena duces tecum for [Rosa]'s psychiatric records; (c) failing to contact attorney Holly Mattice and investigator Gene Borghello, who could have given Tejada much evidence to impeach Rosa with;

G)  The failure to show that Carlos Ramirez does not have a criminal conviction record.

(Clerk's Tr. at p. 372-73.)

The court denied Petitioner's motion for a new trial on November 2, 2007.  In denying the motion for a new trial, the judge stated the following:

The defendant complains that the defendant's trial counsel was ineffective.  He points out victim's motive to lie; that he did not impeach the victim with the prior alleged criminal history; that he did not impeach the victim with alleged prior inconsistent statements; that he did not how the victim's history of making false complaints.

The defense, in its declaration submitted by Mr. Borghello – and that is the declarations of Rosa Ake, Alma Lopez, Maria Ruiz, Massie Zakeri, Erica Casillas, Loriana Lopez, Mary Rosenfield, and Eliza Cobos, Exhibits F, I, J, K, L, M, N, O, are submitted in support of a new trial application.

The Court notes the following:  That the declaration submitted by defendant are investigative summaries of what the witnesses told him.  These summaries are in the form of memos from the investigator to the defendant's first trial lawyer.  The defense investigator repackages the memos into one large declaration.  The decisional law is clear that this sort of single and multiple level hearsay is inadmissible in a new trial application.  The declaration of the investigator contains very little competent evidence.  A new trial motion, – these are hearsay declarations and are not substantial competent evidence in a new trial motion.  They are relevant insofar as what the attorney was aware of, so insofar as the examination of Mr. Tejada as to whether he received those, it is relevant as to that purpose.  As to whether they're true or not, the declaration of Mr. Borghello is incompetent as to whether or not they're true.

The issue here is – the challenged conduct essentially is whether to call certain witnesses.  Such matters are matters of trial tactics.  And unless the decision results from the – unless the decision results from the unreasonable failure to investigate, the Court cannot find that there was an unreasonable failure to investigate.  In fact, there was substantial police reports and documents and statements that were provided to Mr. Tejada, and Mr. Tejada explained on the stand why he did or did not decide to call witnesses.

In the Court's view, and as we've seen here, Mr. Tejada was faced with difficult tactical decisions.  Calling certain witnesses clearly entailed certain risks.  And I would respectfully disagree with Mr. Finkas that calling witnesses that are in the family context is a slam dunk; that they're slam-dunk evidence.  I think that the witnesses that would have been called all had issues.  And whether or not that would have been appropriate is, I think, is evaluating trial counsel's conduct in hindsight and that's second-guessing tactical decisions.

The Court also takes note of the following:  Mr. Finkas indicates this was a credibility contest.  I'm not sure that that is the case.  And I do agree with Ms. Underwood as to every piece of physical evidence, including a sexual assault exam, the injuries sustained by Ms. [Rosa], the testimony of a SART nurse, the injuries that were sustained by blunt force trauma, and the DNA in Ms. [Rosa]'s rectum, which corroborates that the defendant had sodomy with Ms. [Rosa] even though he denied it to the police or in his statement.  So the issue – and the injuries were truly substantial and truly remarkable.

The DA brief touched on this, but I think it's worth restating.  The victim had scratches on her wrist, swelling and bruising around and in her mouth, she had a cut on her lip, and red welts on both her right and left butt cheeks.  The victim also had bruises on her legs.  The victim had anal and rectal tears and bruises, and she had a vaginal abrasion.  So – which are substantial injuries.  Again, this evidence, and uncontradicted evidence, that was facing Mr. Tejada as he was making his trial preparations.  The Court does not find that counsel failed to act in a manner to be expected of reasonably competent attorneys acting as advocates.

And, in addition, the defendant has wholly failed to demonstrate that it's reasonably probable that a more favorable result would have been obtained in the absence of counsel's failings.  The physical evidence in this case just jumps out.  And I must say it is truly remarkable physical evidence that I think would be very difficult for the defendant to explain away, should he have taken the stand.

So, I do appreciate the submissions of Mr. Finkas and Ms.

7

1    Underwood.  The motion for new trial is denied.

2  (Reporter's Tr. at p. 429-32.)

3    Petitioner was sentenced in February 2008.  Petitioner filed an appeal to the California

4  Court of Appeal.  (See Respondent's Lodged Doc. Ex. 3.)  Petitioner did not raise any of the

5  issues he raises in this federal habeas petition in that appeal.  The California Court of Appeal

6  denied that appeal on October 22, 2009.  (See Slip Op.)

7    As his direct appeal was pending, Petitioner also filed a petition for writ of habeas corpus

8  in the California Court of Appeal, First Appellate District (Case No. A123244), which raised the

9  issues Petitioner raises in his federal habeas petition.  The California Court of Appeal summarily

10  denied this state habeas petition without discussion on October 22, 2009.  (See Resp't's Lodged

11  Doc. Ex. 14.)  Petitioner then filed a petition for writ of habeas corpus in the California Supreme

12  Court which raised the ineffective assistance of counsel claims that Petitioner raises in his federal

13  habeas petition.  The California Supreme Court summarily denied the state habeas petition on

14  January 13, 2010.

15    Petitioner filed the instant federal habeas petition in June 2010.  Respondent answered the

16  petition in October 2010.  Petitioner filed a traverse in November 2010.  Oral argument was held

17  on March 5, 2012 and the arguments of counsel have been considered herein.

18                   IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

19    An application for writ of habeas corpus by a person in custody under judgment of a state

20  court can only be granted for violations of the Constitution or laws of the United States.  See 28

21  U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v.

22  Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

23  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

24  and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

25  320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

26  decided on the merits in the state court proceedings unless the state court's adjudication of the

8

claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  See 28 U.S.C. 2254(d).  Where a state court provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether the state court was objectively unreasonable in its application of clearly established federal law.  See Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable application clause, a federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is an objectively unreasonable application of clearly established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only the Supreme Court's precedents are binding . . . and only those precedents need be reasonably applied, we may look for guidance to circuit precedents.").

V.  ANALYSIS OF PETITIONER'S CLAIMS

A.  Claim I

In Claim I, Petitioner argues that his trial counsel was ineffective for failing to impeach

1  Rosa with evidence of her prior criminal acts.  Petitioner argues that trial counsel should have

2  impeached Rosa with the following:  (1) in October 1998, Rosa "accompanied by her then two-

3  year old son in a stroller, stole various items from Macy's in Fairfield.  She was approached by

4  security after leaving the store, and the Macy's merchandise, as well as merchandise from two

5  other stores, were retrieved from under the stroller. [Rosa] initially told the police that her name

6  was Alicia Perez" (Pet'r's Pet. at p. 17.); (2) in June 1999, Rosa stole a purse from the Leather

7  Loft in Vacaville, California; (3) in April 2000, police responded to a report that Rosa had

8  assaulted her children and  "was taking an axe and destroying objects inside the residence, and

9  was attempting to get petitioner to assault her so she could call the police and have him arrested"

10  (Id.); (4) in May 2002, Rosa stole shoes from Mervyn's in Fairfield, California; a subsequent

11  search of found stolen credit cards and driver's licenses on Rosa's person and Rosa "gave

12  conflicting statements regarding the credit cards and the driver's license to store security" and to

13  the police (Id.); (5) in September 2005, police investigated a report that Rosa had sexually abused

14  her daughter.

15       The Sixth Amendment guarantees effective assistance of counsel.  In Strickland v.

16  Washington, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating

17  ineffective assistance of counsel.  First, the petitioner must show that considering all the

18  circumstances, counsel's performance fell below an objective standard of reasonableness.  See id.

19  at 688.  Petitioner must identify the acts or omissions that are alleged not to have been the result

20  of reasonable professional judgment.  See id. at 690.  The federal court must then determine

21  whether in light of all the circumstances, the identified acts or omissions were outside the range

22  of professional competent assistance.  See id.  "[C]ounsel is strongly presumed to have rendered

23  adequate assistance and made all significant decisions in the exercise of reasonable professional

24  judgment."  Id.

25       Second, a petitioner must affirmatively prove prejudice.  See id. at 693.  Prejudice is

26  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

10

result of the proceeding would have been different." Id. at 694.  A reasonable probability is "a probability sufficient to undermine the confidence in the outcome." Id.  "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, __ U.S. __, 131 S.Ct 770, 792, 178 L.Ed.2d 624 (2011).  A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (citing Strickland, 466 U.S. at 697).  When analyzing a claim for ineffective assistance of counsel where a state court has issued a decision on the merits, a habeas court's ability to grant the writ is limited by two "highly deferential" standards. Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 740, 178 L.Ed.2d 649 (2011).  "When § 2254(d) applies the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. (internal quotation marks and citation omitted); see also Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) ("Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied Strickland incorrectly.  Rather, it is the habeas applicant's burden to show that the state court applied Strickland to the facts of his case in an objectively unreasonable manner.") (citations omitted).

Petitioner's trial counsel, Martin Tejada, testified at the motion for new trial hearing.  In response to questioning, Tejada testified that he thought the facts of the various police reports were relatively benign, that bringing up such minor arrests would not help Petitioner and that the age of the relative incidents all entered into his decision to not impeach Rosa on these incidents.  (See Reporter's Tr. at p. 380-84.)  Trial counsel's strategy for impeaching a witness involves tactical decisions that are given great deference.  See Dows v. Wood, 211 F.3d 480, 487 (9th Cir. 2000).  A petitioner pleading ineffective assistance of counsel due to counsel's failure to impeach

11

1   a witness must demonstrate that, had the witness been impeached in the manner requested by

2   petitioner, there would be a reasonable probability that the verdict would have been different.

3   See United States v. Holmes, 229 F.3d 782, 789-90 (9th Cir. 2000).

4        Petitioner's trial counsel was aware of these prior arrests and made the tactical decision

5   not to seek to impeach Rosa with these prior arrests at trial.  Petitioner argues that Rosa's

6   credibility was a key factor and that trial counsel's failure to impeach Rosa on her prior arrests

7   fell below an objective standard of reasonableness.  In Harrington, 131 S.Ct. 770, the Supreme

8   Court explained the analysis a federal habeas court should undertake in analyzing a Strickland

9   claim under AEDPA.  Specifically, the Court stated:

10          The pivotal question is whether the state court's application of the
    Strickland standard was unreasonable.  This is different than asking

11  whether defense counsel's performance fell below Strickland's
    standard.  Were that the inquiry, the analysis would be no different

12  than if, for example, this Court were adjudicating a Strickland
    claim on direct review of a criminal conviction in a United States

13  district court.  Under AEDPA, though, it is a necessary premise
    that the two questions are different.  For purposes of § 2254(d)(1),

14  "an *unreasonable* application of federal law is different than an
    incorrect application of federal law."  Williams, supra, at 410, 120

15  S.Ct. at 1495.  A state court must be granted deference and latitude
    that are not in operation when the case involves review under the

16  Strickland standard itself.

17  Harrington, 131 S.Ct. at 785.  Thus, Petitioner has to show that the adjudication of this Claim in

18  state court was unreasonable not only on whether counsel's performance fell below an objective

19  standard of reasonableness, but also whether its decision on Strickland's prejudice prong was

20  unreasonable.

21       Trial counsel's cross-examination of Rosa was perhaps lacking in several respects.

22  Tejada could have impeached Rosa on whether she had previously been arrested for the items

23  listed above such as shoplifting and burglary, but he chose not to do so for the reasons stated in

24  the motion for new trial transcript.

25       While Petitioner's trial counsel could have perhaps done a better job impeaching Rosa,

26  this does not necessary entitle Petitioner to federal habeas relief.  Even assuming (without

1    deciding) that the state court's adjudication of whether trial counsel's performance fell below an

2    objective standard of reasonableness was unreasonable, Petitioner would still have to show that

3    the state court's rejection of this Claim was unreasonable based on Strickland's prejudice prong

4    as well.  Accordingly, the Supreme Court has explained that "[a] state court must be granted a

5    deference and latitude that are not in operation when the case involves review under the

6    Strickland standard itself."[2]  Harrington, 131 S.Ct. at 785.  "A state court's determination that a

7    claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree" on

8    the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541

9    U.S. 652, 664 (2004)).

10    Even assuming arguendo that the decision that Petitioner's trial counsel's cross-

11    examination of Rosa fell below an objective standard of reasonableness as it relates to Claim I,

12    Petitioner still has not established that he is entitled to federal haebas relief on Claim I.

13    Petitioner has failed to make a showing that the adjudication of Claim I on prejudice grounds was

14    unreasonable for the following reasons.

15    As stated supra, in analyzing Petitioner's motion for a new trial, the judge cited to the

16    physical evidence which implicated Petitioner in the charged crimes.  Petitioner argues that the

17    injuries that Rosa suffered were not substantial and that her injuries were relatively minor.

18    The evidence at trial included detailed testimony about Rosa's injuries.  The SART nurse

19

20    [2] Petitioner takes exception to this stated standard in his objections to the initial findings
and recommendations.  More specifically, Petitioner asserts that the motion for new trial did not

21    raise all of Petitioner's claims, most notably, trial counsel's failure to bring out Rosa's purported
numerous discrepancies at trial as well as trial counsel's failure to introduce witnesses or

22    evidence of Petitioner's good character.  (See Pet'r's Obj. F. & R. at p. 21.)  Petitioner is correct
that not all of the claims he raises in this federal habeas petition were raised in his motion for

23    new trial.  However, AEDPA deference is still applicable.  Even if Petitioner did not raise all of
his claims in his motion for a new trial, they were all raised in his appeal which was summarily

24    denied.  As previously indicated, in cases where the state court has issued a summary denial on
claims for habeas relief, a federal habeas court independently reviews the record to determine

25    whether the state court was objectively unreasonable in its application of clearly established
federal law.  See Musladin, 555 F.3d at 835.  For the reasons described infra, Petitioner failed to

26    satisfy that standard.

1  testified that:

2       there was an approximate half inch diameter small red mark on the
        left [side of the body], and on the right hand side above the right
3       breast there was a half inch diameter bruise, little darker bruising
        area.  [Rosa] also had two bruises on the right leg and a scratch and
4       bruise on the left upper thigh . . . . And on the back . . . there were
        marks on both of her hips and upper thighs just off of what would
5       we term the buttocks that I marked, it was linear marks, four
        straight marks that were side by side in a pattern approximately
6       two inches long each.  They were welt-like, slightly raised, slightly
        reddened on both of her hips.

7

8  (Reporter's Tr. at p. 180-81.)  The nurse also testified that Rosa's injuries to her anus included

9  splits in her skin, bruising in the area all around the anal opening and fluid oozing from the area.

10  (See id. at p. 186.)  The nurse testified that this was indicative of trauma and that in her opinion

11  the injuries that Rosa received to her anal area were forcible injuries.[3]  (See id. at p. 186-87.)

12  The nurse also testified that Rosa had a small scratch and bruise on her left wrist, facial bruising,

13  swelling and a lip laceration.  (See id. at 187-88.)  The nurse stated that these injuries were

14  consistent with what Rosa told her, namely that "slapping, being held down, and anal

15  penetration, would all match the bruises, welts and abrasions that I observed on her body."  (Id. at

16  p. 188.).

17       The record also indicated that male semen DNA evidence found in and around the

18  victim's anus was linked to Petitioner.  The following colloquy took place during trial between

19  the prosecutor and the DNA expert:

20

21       [3] During the trial, the SART nurse testified that with respect to Rosa's injuries to her
    anus, "you do not have injury of that nature such as going to the bathroom or even if you have
22  sexual intercourse using lubrication."  (Reporter's Tr. at p. 187.)  Petitioner argues that this
    supports his "rough sex" theory at trial and his defense that "Rosa orally copulated [him] and
23  transferred the ejaculate onto a dildo which she then inserted into her anus."  (Pet'r's Pet. at p.
    59.)  Petitioner argues that the other injuries Rosa suffered "could" have been self-inflicted.
24  However, beyond Petitioner's mere speculation that these injuries were self-inflicted, he presents
    no hard evidence to support his theory.  See Harrington, 131 S.Ct. at 792 (stating that to establish
25  Strickland prejudice, the likelihood of a different result must be substantial, not just
    conceivable).  Rather, as explained above, the evidence at trial indicated that Rosa's injuries were
26  consistent with her story as she explained it to the SART nurse.

14

1     Q:  And were you able to exclude the defendant as the – as the, I
don't know the word to use, were you able to exclude the
2     defendant as the source of that DNA?
    A:  I assumed the presence of the victim's DNA on her own
3     biological swab.  The suspect could not be excluded as being the
so[u]rce of the male DNA that I recovered from that swab.
4     Q:  Okay.  And once you determined that he was not excluded, did
you then determine the percentage of the population that has the
5     same genetic markers?
    A:  I did a statistical calculation to try to show how common or
6     how rare I would include someone from the random population as
a possible source of that semen.
7     Q:  Okay.  And what statistical significance did you find in this
case?
8     A:  What we do is we provide statistical data for the three major
populations in the State of California, so that would be Caucasian,
9     African American and Hispanic because we're not assuming the
racial origin of the perpetrator.  And what I find is that
10     approximately one in 820,000 Hispanics, one in 1.6 million
Caucasians, and one in 21 million African Americans would not be
11     excluded as being the source of the male DNA in that sperm
fraction.
12     Q:  Is that significant to you?
    A:  Yes.
13     Q:  Okay.  What is – what does that mean?
    A:  That means that in order to find someone else in the Hispanic
14     population that could have been the source of that male DNA on
that rectal swab, I would have to sample 820,000 Hispanics to find
15     one who has the right DNA to be included.

16 (Reporter's Tr. at p. 241-42.)

17       Beyond the physical evidence which implicated Petitioner, Petitioner also made a

18 statement to the police which was inconsistent with the physical evidence produced at trial.

19 When Petitioner was arrested he made a statement to the police that Rosa only orally copulated

20 him on the night of the incident.  This statement was inconsistent with the fact that Petitioner's

21 DNA evidence was found in and around Rosa's anus.  Petitioner attempts to counter this point by

22 arguing that trial counsel should have pursued a defense at trial that Petitioner was framed by

23 Rosa.  Petitioner argues that trial counsel should have argued at trial that Rosa orally copulated

24 Petitioner, then transferred the semen to a dildo which she subsequently inserted into her anus.

25 Under this theory, Petitioner also argues Rosa's physical injuries including her cuts, bruises and

26 red marks were self-inflicted.

1   Petitioner fails to show to a reasonable probability that the outcome of the proceeding

2   would have been different had this theory been attempted.  Petitioner's argument that he was

3   framed is pure conjecture and is not based on any evidence produced at trial or before the state

4   court which would show to a reasonable probability that the outcome of the proceeding would

5   have been different.  Petitioner cites to a forensic expert's report that transferring semen from

6   one's mouth to a dildo and then inserting it in the anus is possible.  However, the fact that an

7   expert provided trial counsel with this report does not establish that Petitioner was prejudiced by

8   counsel's failure to pursue this trial strategy.  The prejudice prong requires a showing that the

9   likelihood of a different result was substantial, not just conceivable.  See Harrington, 131 S.Ct. at

10  792.  The state court determined that the physical evidence against Petitioner, including the

11  physical injuries that Rosa sustained, was strong.  AEDPA's standard requires that deference be

12  given to the state court, even when fairminded jurists could disagree.  See id. at 786.  In light of

13  the physical evidence produced at trial, which included Saldana's injuries which the SART nurse

14  testified was consistent with what Rosa had told her, along with Petitioner's DNA evidence

15  found in and around Rosa's anus, coupled with Petitioner's inconsistent statement to the police,

16  the adjudication of the prejudice prong was not an unreasonable application of the Strickland

17  standard.  See Strickland, 466 U.S. at 694 (stating that a reasonable probability is an a probability

18  sufficient to undermine confidence in the outcome).

19  Among the cases that Petitioner relies on to support his arguments is Reynoso v.

20  Giurbino, 462 F.3d 1099 (9th Cir. 2000).  He asserts that Reynoso indicates that "[c]ourts have

21  found prejudicial error from omissions of counsel far less than those involved here."  (Pet'r's Pet.

22  at p. 61.)  In Reynoso, the Ninth Circuit found that the petitioner had satisfied the Strickland

23  prejudice prong when counsel failed to impeach several witnesses.  It noted that the prosecution's

24  case was weak and that the State presented no physical evidence tying the petitioner to the

25  murder.  See id. at 1102.  In summing up the prosecution's case, the Ninth Circuit explained that:

26        Its case consisted solely of four witnesses, only two of whom were

purportedly eyewitnesses to the events surrounding Prajapati's murder.  The other two witnesses reported that they had heard or overheard confessions that Reynoso had allegedly made.  None of the four suggested that Reynoso was involved in the crime until two or three years after the shooting.  One of the witnesses, Lopez, a jailhouse informant, contacted the police to report a confession allegedly made two years earlier, but only after he had seen a television broadcast and a composite of the suspect, further, he admitted that the availability of a reward had motivated him to get in touch with the police.  One of the other witnesses was Hinojosa, who himself was initially a suspect in the murder.  After failing to implicate his cousins, Hinojosa told police that he had overheard Reynoso discussing the events of the Prajapati murder at a party two years earlier.  At trial, however, he recanted his statements, admitted that he had learned the facts of the murder through news reports on television, and denied knowing Reynoso.

The two eyewitnesses the State presented were Javier Terrones and Robert Mendoza.  There were inconsistencies between their stories – for example, their different descriptions of the make and condition of the getaway car, whether it had been left running, and where it was parked.  Terrones and Mendoza also testified that they never saw each other in the market that has been described as a small grocery or liquor store, even though they both testified that they were in the store when Reynoso walked in and that they left before the shooting occurred.

Mendoza admitted that he had engaged in heavy alcohol and drug use both before and during the day of the murder.  Just two weeks after the shooting, Mendoza singled out from a photographic lineup two individuals other than Reynoso as the perpetrators.  Although he eventually selected Reynoso from a photographic lineup in 1998, three years after the murder, he subsequently identified someone other than Reynoso from an in-person lineup, before changing his mind again and identifying Reynoso.  Further, at the time of Reynoso's trial, Mendoza and Reynoso were placed in the same cell, and even though they were sitting just five or six feet apart, Mendoza did not recognize Reynoso.  He later admitted that it was only after speaking with the prosecutor that he discovered that he had been in the same cell as the person he had identified as the murderer.  Although Mendoza did not testify at the evidentiary hearing because he had died, that hearing revealed that Mendoza had known about the reward when he testified at Reynoso's trial and that he ultimately received $7,500 for his testimony. Terrones, too, did not contact police until three years after the shooting, and after he also had obtained knowledge of the reward. He initially testified at the evidentiary hearing that he did not want any part of the reward money, but later admitted that he had immediately asked about the reward when he contacted police.  At trial, Terrones was able to describe Reynoso only vaguely and said that he had seen him only briefly.  Before identifying Reynoso

17

from both a photographic and live lineup, Terrones had seen an article with his picture that identified him as a leading suspect in the Prajapati murder.  Ultimately, Terrones received $7,500 for his testimony.

<u>Reynoso</u>, 462 F.3d at 1116-17.  In analyzing the prejudice issue, the Ninth Circuit noted that the prosecutor emphasized during his closing argument that neither Terrones nor Mendoza had demonstrated any bias or a motive to lie.  The Ninth Circuit determined that the failure of Reynoso's trial counsel to question the witnesses regarding their financial interests in the award was prejudicial.  <u>See</u> <u>id.</u> at 1117.

Unlike <u>Reynoso</u>, the case against Petitioner did not only rely on eyewitness testimony.  It included physical evidence which implicated Petitioner as the perpetrator of the charged crimes that was lacking in <u>Reynoso</u>.  This included the physical manifestations of the assault that were indicated on Rosa's body.  The SART nurse testified Rosa's injuries were consistent with her story of being raped and assaulted.  It also included Petitioner's DNA in and around Rosa's anus. The location of the DNA evidence was inconsistent with Petitioner's statement to the police that the only sexual activity that occurred between Rosa and himself that night was oral sex.  As previously stated, Petitioner provided no hard evidence that he was framed by Rosa.  Petitioner asserts that the forensic expert's report stated that it is possible for semen to be transferred from one's mouth to a dildo and then inserted into the anus thereby resolving the issue of how Petitioner's DNA got inside Rosa's anus.  However, the expert's proposed hypothetical does not establish that Petitioner is entitled to federal habeas relief.  As previously stated, to show prejudice the likelihood of a different result must be substantial, not just conceivable.  The fact that the expert states that such a transfer of semen from mouth to dildo to anus is a possibility is insufficient to find that the state court's adjudication of this Claim was unreasonable under the prejudice prong.  Furthermore, it is worth noting that the evidence against Reynoso did not include physical evidence nor statements from the defendant that were in direct contrast to the evidence produced at trial.  <u>Reynoso</u> is distinguishable and Petitioner's reliance on this case to

support his prejudice argument is unavailing.

Petitioner's reliance on Williams v. Washington, 59 F.3d 673 (7th Cir. 1995) is also unmoving.  In that case, the Seventh Circuit noted that the only evidence against the petitioner was the molestation victim's direct testimony and the petitioner's co-defendant's confession.  See id. at 682.  The Seventh Circuit noted that counsel should have attempted to protect the petitioner from the co-defendant's confession which inculpated petitioner in the crime.  Additionally, trial counsel could have neutralized the effect of the victim's letter which implicated petitioner in the crimes as well as sought out evidence of the victim's lack of credibility.  See id. at 684. Comparatively, Petitioner's case included physical evidence which implicated Petitioner in the crimes as well as Petitioner's statement to the police which was inconsistent with the physical evidence.

Petitioner's reliance on Moffett v. Kolb, 930 F.2d 1156 (7th Cir. 1991) is also unavailing. In Moffett, the petitioner raised an ineffective assistance of counsel claim and argued that his counsel failed to introduce evidence of a police report containing a witness's [Brown] statements on his knowledge of the shooting.  Specifically, the petitioner asserted counsel was ineffective by failing to introduce this evidence because the report indicated that the witness saw another man [Antonio] lift a gun and that this other person stated after the incident, "if it didn't work, then how come the gun went off when I fired it?"  Id. at 1159-60.  The Seventh Circuit explained that the error that petitioner's trial counsel made was failing to impeach the witness on his statement that he never saw Antonio hold the gun.  The Seventh Circuit also noted that the jury did not hear Brown's statement to the police that Antonio himself had made a statement acknowledging that he had been the person who shot.  See id. at 1161-62.  Ultimately, the court found that these errors were prejudicial because:  (1) there was no direct testimonial evidence that Moffett was the individual who shot; and (2) the strongest evidence that Moffett shot consisted of swabs taken from Moffett's right hand that contained traces of barium and antimony above threshold levels while Antonio's did not.  However, the expert testified that the existence or non-existence of

barium and antimony above threshold levels was not conclusive proof that an individual did or did not fire a gun.  See id. at 1162-63.  Ultimately, the Seventh Circuit decided that if the jury had been aware of Brown's omitted statements, it might have taken a more critical look at the limitations of the barium-antimony evidence.  See id. at 1163.

Unlike Moffett, there was direct testimony from Rosa that Petitioner sexually assaulted her.  While Moffett had physical evidence in the form of the barium-antimony test, the physical evidence in Petitioner's case was different and more damaging.  It included physical manifestations that an assault took place as illustrated on various parts of Rosa's body including her genitals.  As the SART nurse testified, Rosa's injuries were indicative of trauma and consistent with her story of being slapped, held down and that Petitioner had anal sex with her.  (See Reporter's Tr. at p. 186.)  At a minimum, based on the evidence previously described, the state court's denial of Claim I was not unreasonable under the Strickland prejudice prong.  Therefore, Petitioner is not entitled to federal habeas relief on Claim I.

B.  Claim II

In Claim II, Petitioner argues that trial counsel failed to establish Rosa's bias and motive to lie in light of the child custody dispute she was in with Petitioner.  Specifically, Petitioner asserts in his petition that, "[b]oth prior to and after the alleged sexual assault, Rosa had sought to obtain primary custody of the children, but after contested evidentiary hearings, primary custody was awarded to petitioner.  At no time did [trial counsel] bring out these facts, nor did he present any evidence that would have established that Rosa had a motive to lie."  (Pet'r's Pet. at p. 19.)

Petitioner asserts that the child custody issues reflected an ongoing hostile dispute between Petitioner and Rosa that was not brought out at trial.  At trial the following colloquy took place between Petitioner's trial counsel and Rosa on cross-examination:

> Q:  You two would argue about the children?
> A:  Yes.
> Q:  And one of the things that you didn't like about Mr. Ramirez

1         was that he would threaten to keep the children away from you?
        A:  Yes.

2         Q:  Okay.  But you also said you have arranged visits with the
        children, correct?

3         A:  Yes, I do.
        Q:  And how do you have these arranged visits?

4         A:  The first time it was 10:00 in the morning to 4:00 p.m. on the
        afternoon for three days.  That will be 18 hours a week that I see

5         them.
        Q:  Okay.  But how did these visits get arranged?

6         A:  By the court.
        Q:  Okay.  So you went to the court to make sure you could visit

7         your children, correct?
        A:  Yes.

8         Q:  Okay.  And so if you had a problem with not seeing the
        children you could always just go to the courts, correct?

9         A:  Yes . . .
        Q:  So you always knew there was a legal way for you to go ahead

10        and see your children, correct?
        A:  Yes.

11

12 (Reporter's Tr. at p. 118-19.)

13      Petitioner asserts that counsel should have undertaken a more intensive cross-

14 examination of Rosa on the child custody dispute.  Specifically, he argues that:

15         Both prior to and after the alleged sexual assault, [Rosa] had
        sought to obtain primary custody of the children, but after

16        contested evidentiary hearings, primary custody was awarded to
        petitioner.  At no time did Tejada bring out these facts, nor did he

17        present any evidence that would have established that [Rosa] had a
        motive to lie.  That there was any issue at all was only brought out

18        peripherally at trial.

19 (Pet'r's Pet. at p. 19.)

20      Respondent contends that trial counsel's actions were not unreasonable because there

21 were negative aspects that arose during the child custody proceedings against Petitioner that

22 would have been brought out at trial had counsel raised the child custody issue more than he did

23 at trial.  Respondent asserts that:

24         There was evidence that Petitioner had committed domestic
        violence against Rosa, that Rosa had separated from Petitioner and

25        obtained a restraining order against him in July 2000 based on her
        reports that he had been "hitting her in the face with his fists for the

26        past two years" that in a December 2001 incident Petitioner

1        slapped Rosa on the face after she had slapped him on the hand,
and that although Rosa did not have primary custody of her
2        children, she had the right to visit three days a week.

3  (Resp't's Answer at p. 11-12.)  Petitioner responds that the only act of violence against Rosa

4  from Petitioner that was not based solely on the untrustworthy testimony of Rosa was the

5  December 2001 slapping incident which was already admitted at trial.  (See Pet'r's Traverse at p.

6  8.)

7       In Reynoso, the Ninth Circuit differentiated between evidence attacking a witness's

8  general credibility or demonstrating the inconsistency of a witness's statement with evidence

9  which would tend to show why a witness may have had a motive to lie.  See 462 F.3d at 1113.

10  While Claim I focused on trial counsel's purported ineffectiveness for failing to impeach Rosa on

11  general credibility evidence, Claim II is more akin to evidence which would tend to show why a

12  witness may have a motive to lie.  In Reynoso, counsel's performance was deemed insufficient

13  by her failure to cross-examine witnesses about reward money for turning in petitioner.  As

14  described in supra Part V.A, the Ninth Circuit noted that there was no physical evidence which

15  tied the Reynoso to the murder.  However, in Petitioner's case, there was physical evidence

16  which tied him to the charged crimes.  This included the physical manifestations of the assault as

17  indicated by the various injuries found on Rosa as testified to at trial.  Additionally, Petitioner's

18  DNA was found in and around Rosa's anus.  The fact that Petitioner's DNA evidence was found

19  in Rosa's anus was inconsistent with Petitioner's statement to the police that Rosa and Petitioner

20  only engaged in oral sex on the night of the incident.  Thus, while Reynoso instructs that a court

21  should examine motive to lie evidence more closely, in this case, the physical evidence and

22  Petitioner's statement to the police upon his arrest lead to a finding that the state court was not

23  unreasonable in denying this Claim.  Petitioner failed to show to a reasonable probability that the

24  outcome of the proceeding would have been different had trial counsel engaged in a more

25  thorough cross-examination of Rosa on the child custody dispute.  To reiterate, a federal habeas

26  court does not analyze the prejudice prong of an ineffective assistance of counsel claim to

determine whether there is a reasonable probability that the outcome of the proceeding would have been different.  Instead, the analysis is whether the state court's denial of a claim was unreasonable.  While a court might have arrived at a different decision under a *de novo* standard, based on the evidence cited above, Petitioner has failed to meet the burden that the state court's rejection of his claim was unreasonable based on a lack of prejudice.  Accordingly, Claim II should be denied.

In a footnote, Petitioner argues that trial counsel was ineffective for failing to offer evidence on the issue of Rosa's potential motive to lie to gain immigration status.  (See Pet'r's Pet. at p. 30 n. 8.)  In support of this theory, Petitioner cites to 8 U.S.C. § 1229b[4] and argues that

---

[4] 8 U.S.C. § 1229b(b)(2)(A) provides the following:

> The Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien demonstrates that –
>
> (i)(I) the alien has been battered or subjected to extreme cruelty by a spouse or parent who is or was a United States citizen (or is the parent of a child of a United States citizen and the child has been battered or subjected to extreme cruelty by such parent);
> (II) the alien has been battered or subjected to extreme cruelty by a spouse or parent who is or was a lawful permanent resident (or is the parent of a child of an alien who is or was a lawful permanent resident and the child has been battered or subjected to extreme cruelty by such permanent resident parent); or
> (III) the alien has been battered or subjected to extreme cruelty by a United States citizen or lawful permanent resident whom the alien intended to marry, but whose marriage is not legitimate because of that United States citizen's or lawful permanent resident's bigamy;
> (ii) the alien has been physically present in the United States for a continuous period of not less than 3 years immediately preceding the date of such application, and the issuance of a charging document for removal proceedings shall not toll the 3-year period of continuous physical presence in the United States;
> (iii) the alien has been a person of good moral character during such period, subject to the provisions of subparagraph (C);

by lying about the assault, it would enable Rosa to obtain legal status in the United States as a battered spouse.  Respondent argues section 1229b is inapplicable to Rosa because she is in this country illegally and section 1229b only applies to lawful alien residents.  Petitioner contends that the issue is not the applicability of whether section 1229b applied to Rosa but rather whether Rosa believed she could gain immigration status by being deemed a battered spouse thereby giving her a reason and motive to lie about the purported sexual assault.  (See Pet'r's Traverse at p. 17-18.)  However, for the reasons and evidence discussed above, even if the state court's decision was unreasonable because counsel's performance fell below an objective standard of reasonableness, Petitioner has failed to show that the state court's decision was unreasonable based on the prejudice prong.

C.  Claim III

In Claim III, Petitioner argues that trial counsel was ineffective for failing to impeach Rosa with other acts which reflected upon her dishonesty, manipulation and bias.  More specifically, Petitioner argues that trial counsel was ineffective in failing to call witnesses who would have set forth evidence of Rosa's dishonesty and bias.  First, Petitioner argues that trial counsel should have called Erica Casillas, Rosa's former roommate, as a witness.  Petitioner asserts that:

> [Rosa] told Casillas that she wanted to mount a camera in the living room, invite petitioner over, pick a fight with him, get him to hit her in front of the camera, and then use the incident to gain custody of her children. [Rosa] told Casillas she would then call petitioner over to her house, and when he arrived, she wanted Casillas to call the police.
>
> Casillas further reported that [Rosa] had asked her to vandalize petitioner's sister's house and car, and to set fire to the house.

---

(iv) the alien is not admissible under paragraph (2) or (3) of section 1182(a) of this title, is not deportable under paragraphs (1)(G) or (2) through (4) of section 1227(a) of this title, subject to paragraph (5), and has not been convicted of an aggravated felony; and
(v) the removal would result in extreme hardship to the alien, the alien's child, or the alien's parent.

1

2

3

> When Casillas refused, [Rosa] said she would hire someone to do
> it. In or around June 2003, [Rosa] assaulted Casillas when Casillas
> was pregnant. [Rosa] had also stolen money from Casillas' purse.
> Further, [Rosa] had stolen merchandise from stores, and also,
> would take her children to the mall and steal clothes.

4   (Pet'r's Pet. at p. 25.)  Within this Claim Petitioner also argues that his trial counsel was

5   ineffective for failing to call Petitioner's sisters, Rose Ake, Maria Ruiz, and Eliza Cobos.  More

6   specifically, Petitioner asserts that these witnesses would have testified that:

7

8

9

10

11

12

13

> [Rosa] admitted to stealing $8,500 from petitioner.  She told
> Petitioner's sister, Rose Ake, to tell petitioner that she took the
> money to use for purposes of having petitioner killed.  [Rosa] had
> made statements to the effect that if she cannot have the children,
> then nobody will; that she would rather see the children in foster
> care than be with petitioner and his family; that she was angry
> because she believed petitioner had turned their children against
> her; and that she would do whatever it takes to get her children
> back.  [Rosa] mistreated petitioner's parents.  [Rosa] was receiving
> child support from three different men, each of whom she had told
> was the father of her baby.  She had slashed the tires on petitioner's
> truck, and had keyed petitioner's car.  She had made false
> allegations against petitioner's sisters.

14   (Id. at p. 26.)

15          During the hearing, Petitioner's trial counsel was questioned extensively regarding the

16   reasons why he did not call these witnesses.  The following colloquy took place between the

17   prosecutor and Mr. Tejada at the hearing:

18

19

20

21

22

23

24

25

26

> Q:  And, so, did you have a number of witness statements that were
> taken by the investigator, the previous investigator, Mr. Borghello?
> A:  Yes.
> Q:  And how long did you have those prior to going to trial?
> A:  I believe at least a year.
> Q:  Did you have an opportunity to investigate those statements?
> A:  Yes . . . .
> Q:  And did you attempt to contact or subpoena any of those
> witnesses?
> A:  Yes.
> Q:  Okay.  And what happened with that?
> A:  I can't recall specifically in regards to – there was a couple of
> witnesses, which were interested in talking to or subpoenaing, who
> had altercations with the alleged victim in this case.  It was my
> understanding that we – at least one of them had – was no longer
> residing in the country.  And we could not contact either of those
> witnesses.  They were two female witnesses in particular.  I believe

25

1   one of them was a former roommate of the alleged victim in this
    case.
2   Q:  And in looking at and investigating these statements, did you
    also make a determination whether or not the statements that were
3   given to you would even be things that would be admissible in
    court?
4   A:  I did.
    Q:  And so when you were looking to try to contact witnesses, did
5   you look for witnesses that you felt would be admissible in court
    and could offer relevant information to the Court?
6   A:  Yes.
    Q:  So the witnesses that you believed would be relevant, you were
7   unable to locate?
    A:  Correct.
8   Q:  Did you attempt to work with the defendant to try and locate
    them?
9   A:  Yes.
    Q:  And you were unable to do so?
10  A:  Correct.
    Q:  Now, two of the statements, I believe, were given by the
11  defendant's sisters in this case.  Do you remember that?
    A:  Yes.
12  Q:  Okay.  And did you have a lot of contact with his sisters?
    A:  Yes.
13  Q:  Okay.  And did they come to court with the defendant pretty
    much every time he was in court, at least one of them?
14  A:  It was one sister more than anyone else, but, yes.
    Q:  Did you consider calling them as witnesses?
15  A:  I did consider it, yes.
    Q:  Okay.  And why didn't you do that?
16  A:  There were a couple of issues.  One was I didn't know how
    strong their testimony would be, because of the fact they were
17  relatives to Mr. Ramirez.  I thought the prosecution in this case
    would point that out as they were just being biased family
18  members.  There were also some problems, I thought, with the fact
    that they had some incidents with the alleged victim in this case, as
19  well.  There were police reports.  [¶]  There was one report in
    particular that I recall where I believe Mr. Ramirez was accused of
20  domestic violence on the victim.  The sister testified that, in fact, it
    was the victim who struck Mr. Ramirez first, but there was an
21  independent witness who indicated it was Mr. Ramirez who struck
    the victim first.  [¶]  And I thought, based on the totality of the
22  circumstances, that it would create more problems for the case in
    regards to Mr. Ramirez than help him.
23  Q:  And specifically, the incident that you're talking about, was
    that the incident that came into evidence where the child came in
24  and testified in court during the trial?
    A:  Yes, I believe he was still a minor, but some time had passed
25  since the alleged incident.
    Q:  When you're talking about an independent witness, you're
26  talking about him and the other children who were in the street?

26

A:  Yes.  I believe it happened in front of a house, and there were some neighborhood children who were playing, I believe, football at the time . . . .

Q:  Were you afraid that I would be able to – was it your decision strategically not to put her on the stand so that I could not ask her questions about how her statement was inconsistent with the witnesses who were independent?

A:  That was one concern, yes.

Q:  And then the other concern, you said, was that you also felt that because of their bias, their testimony wouldn't be effective?

A:  I wouldn't quite phrase it that way.  It's because they were family members.  I find that often when you bring in a family member to testify on behalf of a client, that the prosecution tends to discredit that person simply because they are a family member; that they're just coming in and they are biased because of – simply because of the fact that they are a family member.  So before I put family members on, I make other decisions to see if they really will be helpful to the case.

Q:  Okay.  And also you talked about that these sisters also had their own altercations with Ms. [Rosa]?

A:  Yes.  They were in contact with Ms. [Rosa] based on their relationship with the victim in this case.  I was concerned that that would be more evidence for the prosecution to point out bias that would actually help – I'm sorry, actually hurt Mr. Ramirez . . . .

Q:  Now, were you aware at the time that you made your decision that, in addition to that, that the – both fo the sisters had made claims against Ms. [Rosa] on a number of occasions that were never prosecuted?

A:  I don't know how many occasions, but I know there was claims, and I saw police reports.

Q:  Were you concerned about that and how that would mess – confuse the issues in this case?

A:  I was concerned on how the prosecution would present that to the jury during Mr. Ramirez's trial.

(Reporter's Tr. at p. 356-62.)

In order to show ineffective assistance of counsel based on the failure to call a witness, the Petitioner must show that the particular witness was willing to testify, see United States v. Harden, 946 F.2d 1229, 1231-32 (9th Cir. 1988); would have testified, see Allen v. Woodford, 366 F.3d 823, 846 n.2 (9th Cir. 2004), amended by, 395 F.3d 979, 1002, n. 2 (9th Cir. 2005); what their testimony would have been (see United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987); and that their testimony would have been sufficient to create a reasonable doubt as to guilt.  See Tinsley v. Borg, 895 F.2d 520, 532 (9th Cir. 1990).

1    The record indicates that trial counsel attempted to locate Erica Casillas but that he was

2    unable to locate her prior to trial.  Petitioner fails to show that the state courts' denial of

3    Petitioner's ineffective assistance of counsel claim for failing to call Erica Casillas was

4    unreasonable.  Counsel testified he tried to locate Ms. Casillas but was unable to leading up to

5    the trial.  Thus, it was not unreasonable to conclude that counsel's performance did not fall below

6    an objective standard of reasonableness.

7    Petitioner's trial counsel also testified during the motion for new trial hearing that he was

8    concerned with possible bias issues if he called Petitioner's relatives as witnesses.  The state

9    courts' denial of this Claim was not an unreasonable application of the Strickland standard.  See

10   McCauley-Bey v. Delo, 97 F.3d 1104, 1106 (8th Cir. 1996) (finding no prejudice from counsel's

11   failure to call witnesses because impact of uncalled witness would have been negligible due to

12   close relationship to defendant); Bergman v. Tansy, 65 F.3d 1372, 1380 (7th Cir. 1995) (holding

13   counsel was not ineffective for failing to call family members who would have easily been

14   impeached for bias); Romero v. Tansy, 46 F.3d 1024, 1030 (10th Cir. 1995) (noting testimony by

15   defendant's family members is of "significantly less exculpatory value than the testimony of an

16   objective witness").

17   Even assuming arguendo that the failure to call the witnesses listed above was an

18   unreasonable application of the first prong of the Strickland standard, Petitioner has still failed to

19   establish that he is entitled to federal habeas relief.  As previously stated, the physical evidence in

20   this case implicated Petitioner in the crime.  Additionally, Petitioner's statement to the police

21   upon his arrest was inconsistent with the DNA physical evidence found in and around Rosa's

22   anus.  Furthermore, at least with respect to a claim that Petitioner failed to call Loriana Lopez as

23   a witness, he did not provide an affidavit from her regarding what her testimony would have

24   been.  See Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000) (denying ineffective assistance of

25   counsel claim based on lack of preparation for failure to call witnesses when no affidavits were

26   submitted to support petitioner's assertion as to what testimony would have been provided).

28

1   Thus, the denial of this Claim was not an unreasonable application clearly established federal law

2   as set forth under the <u>Strickland</u> prejudice prong.  Accordingly, Petitioner is not entitled to

3   federal habeas relief on Claim III.[5]

4         D.  Claim IV

5         In Claim IV, Petitioner argues that his trial counsel was ineffective for failing to impeach

6   Rosa with her purportedly different descriptions of the sexual assault.  For example, Petitioner

7   argues that trial counsel failed to flesh out during cross-examination of Rosa that her statement to

8   police on June 13, 2003 did not mention that Petitioner had a girlfriend and that a phone call

9   Petitioner received by his girlfriend was the reason she did not want to have sex with Petitioner.

10  Petitioner argues that Rosa never mentioned this in previous testimony during the child custody

11  hearing or in her police statement.  Additionally, Petitioner lists the following purported

12  discrepancies in his federal habeas petition that he argues should have been discussed at trial by

13  his counsel:

> 1.   Trial testimony:  Petitioner called [Rosa] at work. Petitioner accused [Rosa] of not taking good care of their children and they argued about this.  Family law case deposition:  Petitioner called [Rosa] at work.  He asked her to sign some papers so she could see the children more.
>
> 2.   Trial testimony:  When she saw petitioner arrive in his truck, she hung up the phone and went outside the store to meet with him.  Statement to Officer Hart:  A short while *after* the phone call, petitioner arrived at her work place and she contacted him at his truck.  Family case law deposition:  After the phone call, she went to her car, and drove around the block to the next street, where petitioner's car was parked.  (At another point in the same deposition, [Rosa] said she went to see petitioner right across the street from her workplace.)
>
> 3.   Trial testimony: [Rosa] knew petitioner was there to have

---

[5] Within Claim III, Petitioner also alludes to the fact that Rosa used aliases and a social security card.  To the extent that Petitioner argues that counsel was ineffective for failing to impeach Rosa on these issues, he is not entitled to federal habeas relief as he fails to show that the denial of this Claim was unreasonable based on the failure of Petitioner to show that denying this Claim on prejudice grounds was unreasonable.

sex and she left work intending to have sex with him. Family law case deposition: She went outside to sign some papers that petitioner wanted her to sign so that she could see their children more often. She did not want or intend to have sex with him, but just wanted her to sign so that she could see their children more often. She did not want or intend to have sex with him, but just wanted to sign the papers and get back to work.

4.   Trial testimony: [Rosa] got into petitioner's truck either immediately, or after first going back to her car. Petitioner was still sitting in the driver's seat. Family law case deposition: [Rosa] argued with petitioner about getting into his truck. Eventually, petitioner came around the truck and opened the passenger door for her.

5.   Trial testimony: Petitioner penetrated her anus. He ejaculated when he tried to put his penis in her vagina. Statement to Officer Hart: He came in her anus, then put his penis in her vagina. Family law case deposition: He ejaculated in her vagina, not her rectum. She was positive of this. She told petitioner she was not taking birth control.

6.   Trial testimony: After the assault, petitioner said he was sorry and drove away. [Rosa] stayed at the scene for a while, then returned to work. Statement to Officer Hart: After the assault, she got dressed and walked away. Petitioner *then* left the area. Family case law deposition: Petitioner drove away as [Rosa] was pulling up her pants and trying to walk to her car.

7.   Trial testimony: At some point during the incident, some rings [Rosa] had been wearing were removed. She did not know if she took them off or if petitioner "grabbed them." Family law case deposition: [Rosa] took her rings off because her hands were swelling.

8.   Trial testimony: After the incident, [Rosa] returned to work, then went home and, at about 11:00 p.m. took a bath. Family case law deposition: After the incident, [Rosa] returned to work, worked until about 11:00 p.m., then picked up her child from the babysitter, went home, and took a shower.

(Pet'r's Pet. at p. 30-32.)

Petitioner is not entitled to federal habeas relief on Claim IV. First, many of the purported inconsistencies listed above were not necessarily inconsistencies. By way of example only, number 6 listed above is not necessarily an inconsistent statement and/or amounts only to a

30

1  trivial difference.  Cf., United States v. Harris, 394 F.3d 543, 556 (7th Cir. 2005) (failing to

2  impeach a witness on trivial matter did not constitute ineffective assistance); Campbell v. United

3  States, 364 F.3d 727, 735 (6th Cir. 2004) (agreeing with analysis that failing to impeach a

4  witness on minor inconsistencies in testimony did not amount to ineffective assistance of

5  counsel).  Item 7 is also trivial and/or not an inconsistency in that it merely indicates that during

6  trial Rosa could not recall how her rings were removed.  Thus, the state court's denial of this

7  Claim was not unreasonable.

8          Additionally, and perhaps more importantly, Petitioner failed to show that the denial of

9  this Claim was an unreasonable application of the Strickland prejudice prong.  The injuries that

10  Rosa suffered illustrated that a sexual assault occurred.  The SART nurse testified that the

11  injuries suffered were consistent with forcible trauma and with Rosa's story as stated in supra

12  Part V.A.  Furthermore, Petitioner's statement to the police that he only received oral sex from

13  Rosa was inconsistent with the DNA evidence found in and around Rosa's anus.  For the

14  foregoing reasons, Petitioner is not entitled to federal habeas relief on Claim IV.

15          E.  Claim V

16          In Claim V, Petitioner argues that trial counsel was ineffective for failing to introduce two

17  pictures of Rosa that were purportedly inside a Father's Day card Petitioner received from his son

18  that depicted Rosa inserting a dildo into her anus.  Petitioner argues that the photos were relevant

19  because they had a tendency to prove or disprove the truthfulness of Rosa's testimony.  (See

20  Pet'r's Traverse at p. 31.)  Petitioner asserts:

21          That [Rosa] sent the photographs to petitioner is highly relevant to
            [Rosa]'s credibility.  It makes no sense that someone who had been
22          violently attacked and raped or sodomized would, a short time after
            the attack, send their assailant explicit photographs of themselves.
23          That [Rosa] did so in this case reflects at the very least that she was
            not afraid of petitioner, and wanted to maintain an ongoing, sexual
24          relationship with him.  The fact that one of the photographs depicts
            her inserting a dildo into her anus is particularly telling in light of
25          her allegations that petitioner sodomized her.  It appears as if she is
            taunting petitioner.  At the very least, she clearly was not behaving
26          towards petitioner as one would expect of someone who had just

31

1     been viciously assaulted.

2  (Id.)

3       In response, Respondent cites to the motion for new trial transcript and explains that trial

4  counsel stated that he chose not to use these photographs because they were taken after the

5  alleged assault.  Petitioner responds that they are relevant to Rosa's credibility and illustrate she

6  wanted to continue a sexual relationship with him even after being sexually assaulted.

7       The timing of when the photos were taken does have some initial facial appeal,

8  particularly after considering the fact that trial counsel's only stated reason for not seeking to

9  admit the photographs was that they were taken after the incident.  See Duncan v. Ornoski, 528

10  F.3d 1222, 1237 n. 7 (9th Cir. 2008) ("In light of the Supreme Court's admonitions that

11  reviewing courts may not substitute their own strategic reasoning for that of trial counsel in order

12  to find that counsel's performance was justified, we do not consider these additional speculative

13  justifications to be Cheroske's *actual* reasons for declining to test Duncan's blood.  See Wiggins

14  [v. Smith], 539 U.S. [510], 526-27 [2003] ("[T]he 'strategic decision' the state courts and

15  respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more

16  a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations

17  prior to sentencing."); see also Alcala v. Woodford, 334 F.3d 862, 871 (9th Cir. 2003) ("We will

18  not assume facts not in the record in order to manufacture a reasonable strategic decisions for

19  Alcala's trial counsel."); United States v. Burrows, 872 F.2d 915, 918 (9th Cir. 1989) (per

20  curiam) (holding trial counsel deficient for failing to investigate an insanity defense partly

21  because "the district court's assumptions that the attorney must have considered an insanity

22  defense and might have rejected it for strategic reasons appear not to have been based on the

23  record")).

24       Nevertheless, even assuming *arguendo* that it was an unreasonable application of the first

25  prong of the Strickland test when the state court concluded that trial counsel's performance did

26  not fall below an objective standard of reasonableness with respect to attempting to admit the

1  photographs, Petitioner failed to show that denying this Claim under the <u>Strickland</u> prejudice

2  prong was unreasonable.  For the reasons previously discussed, the case against Petitioner

3  included not only the testimony of Rosa, but also physical evidence which showed that a sexual

4  assault occurred and which linked Petitioner to the crime.  This included injuries in and around

5  Rosa's genitals as well as cuts and bruises all around Rosa's body.  The SART nurse testified

6  that these injuries were consistent with trauma and that they were consistent with Rosa's story.

7  Furthermore, Petitioner's statement to the police was inconsistent with the DNA evidence of

8  Petitioner found in and around Rosa's anus.  Finally, it is worth noting that evidence of Petitioner

9  and Rosa's sexual relationship after the sexual assault occurred was admitted at trial.  Thus,

10  Petitioner failed to show that the adjudication of this Claim was unreasonable in determining that

11  the outcome of the proceeding would have been different had counsel sought to admit the two

12  dildo photographs at trial.  Thus, Claim V should be denied.

13     F.  Claim VI

14     In Claim VI, Petitioner makes several distinct arguments.  Specifically, he argues that

15  counsel was ineffective because he, "never consulted with a forensic expert in the field of sexual

16  assault.  He never subpoenaed records from Planned Parenthood regarding what Rosa had told

17  Planned Parenthood about her injuries.  He did not attempt to contact anyone who might have

18  been connected to the ambulance which Rosa had said was nearby at the time of the incident."

19  (Pet'r's Pet. at p. 34-35.)  Additionally, Petitioner argues that trial counsel was ineffective for

20  failing to subpoena any of Rosa's psychological records.  (<u>See</u> <u>id.</u>)

21     With respect to the forensic report, Petitioner cites to a forensic report dated December 9,

22  2004.  In the report, the forensic expert was asked whether Rosa could have transferred semen

23  from her mouth, after oral copulation, to her rectum.  The forensic expert stated in her report that:

24          In general, if we assume that ejaculation occurred during an act of
           oral copulation, it is possible that the semen could be collected
25          from the person's mouth by a variety of means (ie spitting into a
           container or onto a piece of cloth/towel/Kleenex).  It is also
26          possible that any collected semen can then be transferred via

contact to another object (ie dildo)/body part.  However, the transfer of semen would be more effective if the semen was still wet (in liquid form or still wet on cloth/towel/Kleenex).  Dried semen stains have the ability to transfer semen to another object but to a lesser degree.

More specific to this particular case, are the following issues:

1.  The swabs were taken from the interior of the rectum.  Therefore the semen would have had to be inserted into the anus or somehow come in contact with the interior of the anus.  A dildo could have been used to perform this function.  However, the amount of semen that can be transferred effectively (minimizing loss) to a dildo and then transferred effectively to a person's anal cavity is an unknown quantity and cannot realistically be estimated.

2.  Rosa states on the OCIP form that she defecated and bathed/took a shower after the alleged sodomy occurred.  Both of these acts would effectively lower the number of sperm present in her anal cavity.

(Pet'r's Pet. Ex. 1-EE.)  Petitioner argues that by failing to call any forensic expert, it illustrates that trial counsel did not properly investigate the case because he failed to make informed decisions.  (See Pet'r's Traverse at p. 32-33.)

At the outset, the expert stated that the scenarios that she presented in her report "do not realistically account for the injuries on Rosa's person as documented on the OCJP form that she alleged she received during the sexual assault including injuries to her anal area.  These injuries appear consistent with her statement of events."  (Pet'r's Pet. Ex 1-EE.)  Even the forensic expert recognized that the physical injuries suffered by Rosa were consistent with a sexual assault.  Petitioner failed to show that it was unreasonable to conclude that Petitioner did not suffer prejudice by counsel's failure to call a forensic expert.  As previously explained, the prejudice prong of the Strickland test requires a substantial showing that the outcome of the proceeding would have been different, not merely that such a showing is conceivable.  See Harrington, 131 S.Ct at 792.  In this case, the fact that an expert stated that while it was possible to transfer semen

34

to a dildo and then insert it into an anus after a male is orally copulated, does not establish to a reasonable probability that the outcome of the proceeding would have been different had such a defense been attempted.  The physical evidence cited by the state court in finding that there was no prejudice was not an unreasonable application of clearly established federal law.  While the alternative defense theory was perhaps theoretically possible, it was not unreasonable to find that the Petitioner failed to show that he was prejudiced for failing to call the forensic expert in light of the evidence against Petitioner as previously described.

Next, Petitioner argues that his trial counsel was ineffective for failing to subpoena records from Planned Parenthood regarding what Rosa had told Planned Parenthood about her injuries the day after the incident.  As Petitioner admits in his traverse, "it is unknown what is in the records."  Thus, Petitioner fails to show that the state court's rejection of this Claim was unreasonable.  Petitioner cannot show to a reasonable probability that subpoenaing the Planned Parenthood records would have changed the outcome of the trial.  Petitioner's prejudice argument is mere speculation as to what the records contained and does not rise to the level sufficient to undermine the outcome of the trial.

Petitioner also argues that trial counsel was ineffective for failing to contact anyone connected to an ambulance which Rosa said was nearby at the time of the purported assault.  In his traverse, Petitioner asserts that, "[i]t is unknown if anyone connected to the ambulance witnessed the incident because Tejada failed to investigate this possibility.  A reasonably competent attorney would have attempted to locate witnesses who at the time of the alleged assault were, according to [Rosa]'s testimony in the family law case, 'parked like not even one block from us.'" (Pet'r's Traverse at p. 36.)  However, Petitioner presents no evidence to a reasonable probability that he was prejudiced by this error.  He fails to present any evidence as to what these unnamed ambulance witnesses would have stated in their trial testimony.  Thus, he fails to show to show that the denial of this argument was unreasonable.

Petitioner next argues that trial counsel was ineffective when he failed to subpoena

35

Rosa's psychological records.  In his traverse, Petitioner states that "[t]he records might have contained information which could be used to impeach [Rosa]'s credibility regarding the subject assault."  However, Petitioner's claim of ineffectiveness with respect to this argument is purely speculative such that he fails to show to a reasonable probability that the outcome of the proceeding would have been different had these records been subpoenaed.  Furthermore, it is worth reiterating that this case was not only based on Rosa's testimony, but also on the physical evidence.  The SART nurse testified at trial that Rosa's injuries were consistent with trauma and consistent with Rosa's story.  Additionally, Petitioner's statement to the police upon his arrest was contradicted once his DNA was found in and around Rosa's anus.

For the foregoing reasons, Petitioner is not entitled to federal habeas relief on any of his ineffective assistance of counsel arguments within Claim VI.

G.  Claim VII

In Claim VII, Petitioner argues that trial counsel was ineffective when he failed to have Petitioner testify.  "[A] defendant in a criminal case has the right to take the stand and to testify in his or her own defense.  Rock v. Arkansas, 483 U.S. 44, 49 (1987).  Because the right is personal, it may be relinquished only by the defendant himself, and his relinquishment of that right must be knowing and intentional.  See United States v. Pino-Noriega, 189 F.3d 1089, 1094 (9th Cir. 1999).  However, a defendant's waiver of the right to testify need not be explicit, and may be inferred from his failure to testify or to notify the trial court of his desire to do so.  See id. at 1094-95.  Additionally, "[a]lthough the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to have him testify."  United States v. Joelson, 7 F.3d 174, 177 (9th Cir. 1993).  "[I]f the defendant wants to testify, he can reject his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer."  Id.  Thus, "[w]hen a defendant remains 'silent in the face of his attorney's decision not to call him as a witness,' he waives the right to testify."  Pino-Noriega, 189 F.3d at 1095 (quoting United States v. Nohara, 3 F.3d 1239, 1244 (9th Cir. 1993)); see also

1    <u>Dows v. Wood</u>, 211 F.3d 480, 487 (9th Cir. 2000) ("Dows argues that Egger denied him his right

2    to testify at trial by threatening to walk out on Dows int eh middle of trial if he insisted on

3    testifying.  Again, this argument is without factual support.  In its order denying Dows a new

4    trial, Judge Martinez noted that at no time during the trial did Dows ever indicate that he wanted

5    to testify or that he was prevented from doing so by counsel."); <u>Gutierrez v. Subia</u>, Civ. No. 07-

6    742, 2008 WL 1968357, at *15-16 (C.D. Cal. Apr. 30, 2008) (finding no ineffective assistance of

7    counsel because petitioner waived claim because there was no indication in the record that he

8    contemporaneously made known any desire to testify during trial); <u>McElvain v. Lewis</u>,  283 F.

9    Supp. 2d 1104, 1118 (C.D. Cal. 2003)  (finding that where petitioner remained silent when trial

10   counsel rested without calling him as a witness that petitioner waived right to testify and cannot

11   claim ineffective assistance of counsel due to trial counsel's failure to call him as a witness);

12   <u>Dewberry v. Cambra</u>, Civ. No. 97-2408, 1998 WL 908923, at *11 (N.D. Cal. Dec. 22, 1998)

13   (denying petitioner's claim that counsel was ineffective in advising him not to testify because

14   petitioner did not object at trial).

15         Petitioner cites to several declarations to support this Claim.  First, Petitioner relies on his

16   habeas counsel's declaration in which she states that, "based on my communications with

17   petitioner, and also, discussions [she has] had with his sisters, that petitioner was at all times,

18   ready, willing and able to testify on his own behalf at the trial of this matter.  During discussions

19   with Tejada, Tejada advised petitioner not to testify.  Petitioner adamantly disputes Tejada's

20   contention, at the hearing on the motion for new trial, that he chose not to testify.  Petitioner,

21   was, in fact, eager to testify and to refute Rosa's allegations, but was discouraged by Tejada from

22   doing so." (Pet'r's Pet. Ex. 1 at ¶ 10.)  Petitioner's sisters also provided similar declarations.  For

23   example, Rose Ramirez stated that she "was present during conversations between petitioner and

24   Martin Tejada regarding whether or not petitioner should testify.  I heard Mr. Tejada tell

25   petitioner that it would not be a good idea for him to testify, and that it would ruin the outcome

26   of the trial.  I never heard petitioner indicated that he did *not* want to testify.  Petitioner at all

1   times expressed a desire to testify in this matter." (Id. Ex. 6 at ¶ 6.)  Petitioner's other sister,

2   Maria Ruiz as well as Petitioner's friend, Alma Lopez submitted similar declarations.  (See id.

3   Ex. 7 at ¶ 6 & 8.)

4          Claim VII should be denied.  Petitioner was silent during trial regarding his request to

5   testify at trial.  See, e.g., United States v. Edwards, 897 F.2d 445, 447 (9th Cir. 1990) ("Neither

6   the prosecution nor the court was given any reason to think the defendant desired to testify.  In

7   such circumstances, [t]o hold that a defendant may abide by his lawyer's advice and not take the

8   stand and then invalidate the trial because he so acted is not fair to the government.") (internal

9   quotation marks and citation omitted); see also, Carter v. Lee, 283 F.3d 240, 249 (4th Cir. 2002)

10  ("the advice provided by a criminal defense lawyer on whether his client should testify is a

11  paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective

12  assistance.") (internal quotation marks and citations omitted).  Petitioner remained silent when

13  trial counsel rested without calling Petitioner as a witness.  For these reasons, Petitioner fails to

14  show that he is entitled to federal habeas relief on this ineffective assistance of counsel claim.

15         H.  Claim VIII

16         In his final Claim, Petitioner argues that his trial counsel was ineffective for failing to

17  introduce evidence of his good character.  In this case, it is easier to analyze this Claim under

18  Strickland's prejudice prong.  In light of the evidence against Petitioner which included not only

19  Rosa's testimony, but the physical manifestations of the sexual assault on Rosa, Petitioner's

20  DNA evidence found in and around Rosa's anus, and the fact that Petitioner's statement to the

21  police was inconsistent with this DNA finding, Petitioner failed to show that additional character

22  evidence would have changed the outcome of the proceeding to a reasonable probability.  Thus,

23  the denial of this Claim was not unreasonable.

24         I.  Cumulative Error

25         While not listed as a separate claim by Petitioner in his counseled habeas petition,

26  Petitioner also argues that "[t]he combined effect of all the omissions was stunning and

1  unquestionably prejudiced petitioner and deprived him of a fair trial."  (Pet'r's Pet. at p. 60.)

2  Thus, Petitioner asserts a claim of cumulative ineffective assistance of counsel based on the

3  purported errors listed above.  "Cumulative error applies where, although no single trial error

4  examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of

5  multiple errors has still prejudiced a defendant."  Jackson v. Brown, 513 F.3d 1057, 1085 (9th

6  Cir. 2008).  Nevertheless, as described above, Petitioner failed to show that counsel was

7  ineffective on some of the Claims described supra.  Furthermore, even assuming *arguendo* that

8  the adjudication by the state court that counsel's performance was an unreasonable application of

9  clearly established federal law, Petitioner still would not be entitled to federal habeas relief on

10  this cumulative error argument.  The evidence against Petitioner included not only Rosa's

11  testimony regarding the sexual assault, but also the physical manifestations of the assault which

12  the SART nurse testified to were consistent with Rosa's story.  Furthermore, Petitioner provided

13  a statement to the police that was inconsistent with the DNA evidence found in and around

14  Rosa's anus.  Accordingly, under these circumstances, Petitioner fails to show that the

15  adjudication of this argument by the state court was an unreasonable application of clearly

16  established federal law based on the prejudice prong.

17  VI.  CONCLUSION

18  Accordingly, IT IS HEREBY ORDERED that the findings and recommendations entered

19  March 20, 2012 is VACATED.

20  IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be

21  DENIED.

22  The amended findings and recommendations is submitted to the United States District

23  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

24  days after being served with these amended findings and recommendations, any party may file

25  written objections with the court and serve a copy on all parties.  Such a document should be

26  captioned "Objections to Magistrate Judge's Amended Findings and Recommendations."  Any

reply to the objections shall be served and filed within seven days after service of the objections.

The parties are advised that failure to file objections within the specified time may waive the

right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In

any objections he elects to file, Petitioner may address whether a certificate of appealability

should issue in the event he elects to file an appeal from the judgment in this case.  See Rule 11,

Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of

appealability when it enters a final order adverse to the applicant).

DATED:  June 6, 2012

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE

40